# In the United States Court of Federal Claims

No. 14-1196C
(Filed April 29, 2017)

```
* * * * * * * * * * * * * * * *
                              *
                              *
SENATE BUILDERS AND           *
CONSTRUCTION MANAGERS,        *
INC.,                         *
                              *
            Plaintiff,        *
                              *
      v.                      *
                              *
THE UNITED STATES,            *
                              *
            Defendant.        *
                              *
* * * * * * * * * * * * * * * *
```

Breach of contract; equitable
adjustment; differing site conditions;
implied-in-fact contract; estoppel;
excavation; Army Corps of Engineers;
summary judgment; unreasonable
contract interpretation.

*Travis L. Kreiser,* Kreiser & Associates, P.C., of Havertown, Pa. for plaintiff.

*Jeffrey M. Lowry*, Commercial Litigation Branch, Civil Division, Department of Justice, with whom were *Benjamin C. Mizer*, Principal Deputy Assistant Attorney General, *Robert E. Kirschman, Jr.*, Director, and *Deborah A. Bynum*, Assistant Director, all of Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

WOLSKI, Judge.

Plaintiff, Senate Builders and Construction Managers, Inc. (Senate Builders) filed this claim against the United States seeking to recover the costs it incurred importing backfill in connection with a construction contract between Senate Builders and the United States, acting through the United States Army Corps of Engineers (Army Corps or the agency).  Compl. ¶¶ 2,  9–11.  Pending before the Court are dispositive motions filed by both parties.  Senate Builders seeks to recover under a number of legal theories --- equitable adjustment, differing site conditions, implied contract, and estoppel, *see id.* ¶¶ 12–41 --- but at bottom, all of its claims hinge on a single contention:  that one answer provided by the agency to an offeror's question meant that all soil at the construction site would be suitable for use as backfill.  *Id.* ¶¶ 8–9.  The agency argues that it made no such

representation, and that Senate Builder's argument to the contrary rests upon an unreasonable reading of the contract. Def.'s Mot. for J. on the Pleadings & Summary J. & Appendix (Def.'s Mot.) at 23–24. This dispute, the reasonableness of Senate Builders' reading of the contract, is the only question before the Court. If the government is correct, all of plaintiff's claims fail. As discussed in more detail below, plaintiff's reading of the contract is unreasonable, and as a consequence, the government's motion is **GRANTED** and plaintiff's cross-motion is **DENIED**.

## I. BACKGROUND

### A. The Solicitation and Pre-Award Exchanges

On March 13, 2012, the Army Corps issued Solicitation No. W912DS-12-R-0010-0015 (the solicitation), for a design/build contract regarding two explosives storage magazines to be located at Picatinny Arsenal in New Jersey. Def.'s App. (DA) at 1, 24–25, 72–73. The contractor was to demolish the two existing magazines and replace them with new structures. Both of these new structures were to be covered with a minimum of 2 feet of earth, on all sides except the loading-dock side. *Id.* DA at 8. The contract had two firm-fixed price Contract Line Items (CLINs) and one unit price CLIN. DA at 76–77. One firm-fixed price CLIN, CLIN 0003, was for asbestos removal and the unit price CLIN, CLIN 0002, was for rock excavation. *Id.* The dispute before the Court only concerns the construction of the new structures, which was part of the remaining firm-fixed price CLIN, CLIN 0001. *Id.*

The solicitation called for certain excavation work to be performed to allow for the installation of the foundations for the new structures as well as trenches for a storm sewer system. *Id.* at 26, 33, 45. The contractor was directed to "[e]xcavate unsatisfactory materials encountered within the limits of the work below grade and replace with satisfactory materials." *Id.* at 34. The solicitation also informed offerors that should they encounter either "unyielding" or "unstable" materials during such excavation those materials were to be replaced with "select granular material."[1] DA at 35, 39. "Select granular material" was defined in the solicitation as material classified as "GW" or "SW"[2] by ASTM D 2487, a classification scheme incorporated into the contract, DA at 29, 172. The solicitation also defined "GW" or "SW" as "satisfactory material," a term used at various points in that document to

---

[1] Unyielding materials were defined to include "weathered rock, dense consolidated deposits, or [certain] conglomerate materials," DA at 29, and could also be replaced with initial backfill, *id.* at 39. Unstable materials were defined as "too wet to properly support the utility pipe, conduit, or appurtenant structure." *Id.* at 29.

[2] The ATSM D 2487 defines "GW" as well-graded gravel and "SW" as well-graded sand. DA at 174.

refer to soil that was suitable for various purposes, including use as backfill and for embankments.  DA at 28, 38, 40–41.  The contractor was directed to use "satisfactory materials" that it had excavated for embankments and backfill, and to dispose of excess satisfactory materials, as well as unsatisfactory materials, but the contractor was not to waste any satisfactory materials.  DA at 33–34, 38.  The solicitation also provided additional restrictions on the soil that could be used for embankments, limiting the size of the rocks that could be present and requiring that no frozen or organic material be included.  DA at 41.

The solicitation also informed offerors that there was "no borrow/material at the Picatinny Arsenal" --- that is, that the only materials available on the worksite would be the materials that the contractor excavated.  DA at 36, 125.  Prospective contractors were informed that they would be responsible for obtaining the rights to, and paying all costs associated with, acquiring materials from an offsite borrow.  DA at 36.  Additionally, the solicitation provided guidelines for submitting test results from a proposed borrow site to the contracting officer, who had to approve any offsite borrow site.  DA at 31–32.

Because of the contemplated reuse of excavated soil by the contractor, and the specifications regarding the type of soil that could be used for different purposes, a geotechnical report was included with the solicitation.  DA at 6.  That report detailed the results of two test borings that had been conducted at the construction site.  DA at 9.  These borings, one taken from each of the sites where the new buildings were to be erected, DA at 17, indicated that the soil at one of the building sites was "GM"[3] soil, *id.* at 22.  The report for the boring at the other building site left the soil classification section blank, but indicated that the soil was brown gravel, with some sand, little silt, and 13% fines.  DA at 23.  Soil with these characteristics meets the definition of "GM" soil contained in ATSM D 2487.  DA at 174.  As noted above, "GM" was not "satisfactory material" within the meaning of the solicitation.  DA at 28.

The solicitation informed offerors that there would be a single site visit for all prospective offerors.  DA at 136.  The provision addressing the site visit warned offerors that they were "responsible to determine existing conditions of the site, and the buildings to be renovated."  *Id.* at 137.  Representatives of Senate Builders did not attend the site visit.  DA at 48–50; Ex. A to Pl.'s Resp. in Opp'n to Def.'s Mot. for J. on the Pleadings & Summ. J. & in Supp. of  Pl.'s Cross-Mot. for Summ. J. and Request for Oral Arg. (Pl.'s Ex. A) at 1–2; Ex. B to Pl.'s Resp. In Opp'n to Def.'s Mot. for J. on the Pleadings & Summ. J. & in Supp. of  Pl.'s Cross-Mot. for Summ. J. & Request for Oral Arg. (Pl.'s Ex. B) at 2.

As noted above, one part of the excavation work the contractor had to perform was digging trenches for a storm sewer system.  The solicitation informed

---

[3] The ATSM D 2487 defines "GM" as "[s]ilty gravel."  DA at 174.

offerors that, should "unsuitable materials" be encountered below the location where the contractor was to place the bedding for the trenches, such unsuitable material should be "remove[d] and replace[d] with 12 inches of additional bedding, or as directed by the contracting officer." DA at 45.  This instruction, and the drawing to which it was attached, provoked a question from a prospective offeror (not Senate Builders) which is the central focus of this case:

### 27. Question

Note 2 for detail "Typical Trench, Storm Sewer System" on Page C-501 shows that additional excavation may be required if unsuitable material is encountered.  The unsuitable material will be replaced with 12" of additional suitable bedding.  The same applies to the buildings excavation, as indicated in paragraph 1.1.1 Excavation, in section 31-00-00 Earthwork, of the specifications.  Shouldn't a separate item be created for the select backfill material required to replace the excavated unsuitable material?  It is impossible to figure out a quantity at this time since we don't know what the existing conditions will be until excavation is started?

Response:

Contractor to assume unsuitable material is not encountered.

DA at 58.

The above answer (and question) was included in Amendment 6 to the solicitation. DA at 58, 74–75.  That amendment also contained a number of other questions and answers addressing whether certain types of materials located on site could be used as backfill.  In its answer to each of these questions --- such as one asking "[i]f rock is crushed on site can we use this material as backfill?" --- the agency informed bidders that "[m]aterial that satisfies fill specification requirements can be used on site." DA at 53.  Another contractor asked "[i]f concrete and brick from building is crushed on site can it be used as backfill material?"  *Id.*  The answer, again, was that "[m]aterial that satisfies fill specification requirements can be used on site."  *Id.*  Another question and answer contained in Amendment 6 spoke directly to the issue of whether excavated materials found on site could, as a general matter, be used as backfill.  A contractor asked: "Can we dispose of all excavated material on site? If not, can we use as backfill material? What is the largest size material with rock in it that we can use as backfill material?" DA at 52.  To this, the government responded:  "Refer to amendment #5. Backfill material shall comply with specification ASTM D 2487 cohesion-less fill criteria requirements."  *Id.* [4]   In short, the questions and answers

---

[4]  A copy of Amendment 5 was not submitted by either of the parties.

contained in Amendment 6 leave no doubt that if materials were to be used as backfill they had to meet the requirements of the solicitation and that it was uncertain how much of the material on site was suitable for such use.

## B. Contract Award and Performance

On July 18, 2012, the agency awarded the contract to Senate Builders, at a price of $1,686,168 for CLIN 0001.  DA at 73, 76.[5]  The contract incorporated a number of Federal Acquisition Regulation (FAR) provisions, including § 52.243-1, Changes; § 52.236-2, Differing Site Conditions; and § 52.236-3, Site Investigation and Conditions Affecting the Work.  DA at 80–81.  Pursuant to the Differing Site Conditions clause, Senate Builders had to give prompt written notice to the contracting officer of any "subsurface or latent physical condition at the site which differs materially from those indicated in the contract," 48 C.F.R. § 52.236-2(a), or "unknown physical conditions at the site, of an unusual nature, which differ materially from those ordinarily encountered," *id.*  After such notice, and if the contracting officer determines that the conditions so warrant, the contract provides that an equitable adjustment shall issue to reflect the increased costs of performance due to the differing site condition.  48 C.F.R. § 52.236-2(b).

On August 9, 2012, the agency issued the notice to proceed to Senate Builders.  DA at 154.  Senate Builders completed the contract on time, with three contract modifications being issued over the course of performance.  DA at 155–61.  The first authorized an increase in the quantity of rock to be excavated because the amount of rock discovered during performance exceeded the estimate.  DA at 155–56.  The second modification related to the addition of a six-inch drainage pipe and of grout above the doors of both structures.  DA at 157–159.  The final modification authorized the installation of drip-edges over the doors on the structures.  DA at 161.

After performance of the contract had begun, Senate Builders raised concerns about what material constituted "satisfactory material" for use as backfill around the newly constructed buildings.  DA at 162.  Senate Builders, and one of its sub-contractors, had apparently understood the answer to Question 27, reproduced above, to mean that all soil on site would meet the requirements for use as backfill. *Id.*  When Senate Builders encountered soil on site which did not meet the solicitation's requirements for backfill, Pl.'s Ex. B at 8, it requested clarification from the administrative contracting officer regarding the requirements for backfill, DA at 162.  In his response to those concerns the administrative contracting officer

---

[5]  The price for CLIN 0002, mass rock excavation and disposal, was $53,546, based on an estimated 350 cubic yards of rock.  DA at 76.  Asbestos removal, under CLIN 0003, was to cost $16,392.  DA at 77.

reminded Senate Builders of the definition of satisfactory material provided in the solicitation. DA at 162. The administrative contracting officer rejected Senate Builder's reliance on Question 27, noting that its interpretation ignored the context in which the question was asked and consequently did not represent a correct interpretation of the contract. *Id.* at 162–63. In closing, he informed Senate Builders that if it did not agree with his interpretation of the contract, it could submit a formal claim. *Id.* at 163.

Senate Builders followed the administrative contracting officer's advice and submitted a certified claim to the contracting officer on March 28, 2014. DA at 163; Pl.'s Ex. A at 10–11. In his denial, the contracting officer recited the various provisions of the contract governing the types of material that could be used as backfill, DA at 165–167, and again rejected Senate Builders' reliance on Question 27, DA at 169–70. The contracting officer, just as the administrative contracting officer had done in the context of Senate Builders' informal claim, observed that its reliance on Question 27 failed to take into account the context of that question and answer --- namely, that it was addressed to the excavation of materials found at the bottom of trenches. DA at 169–170. In sum, the contracting officer noted that nothing about the question, or the answer, concerned the amount of material meeting solicitation requirements "that would be needed to construct an embankment around the bunker, and whether that material would be found on site." *Id.* at 170.

## II.  DISCUSSION

### A.  Legal Standards

Government contract disputes are adjudicated under normal principles of contract interpretation. *See McAbee Constr., Inc. v. United States*, 97 F.3d 1431, 1434–35 (Fed. Cir. 1996); *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991). The purpose of interpreting a contract is, of course, to "accomplish the intention of the parties." *In re Binghamton Bridge*, 70 U.S. (3 Wall.) 51, 74 (1865); *see also Intergraph Corp. v. Intel Corp.*, 241 F.3d 1353, 1354 (Fed. Cir. 2001); *Tecom, Inc. v. United States*, 66 Fed. Cl. 736, 747 (2005).

The Court will interpret a contract in such a way as to give meaning to all the provisions of the contract in light of the parties' intent at the time they entered the agreement. *Tecom*, 66 Fed. Cl. at 747. A contract must be "interpreted so as to harmonize and give meaning to all of its provisions, and [thus] an interpretation which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result." *Arizona v. United States*, 216 Ct. Cl. 221, 235–36, 575 F.2d 855 (1978); *see also, e.g., Gould*, 935 F.2d at 1274; *United States v. Johnson Controls, Inc.*, 713 F.2d 1541, 1555 (Fed. Cir. 1983); *Tecom*, 66 Fed. Cl. at 747.

The Court will first consider the plain language of the contract's terms. *See, e.g., Forman v. United States*, 329 F.3d 837, 842 (Fed. Cir. 2003); *Gould*, 935 F.2d at 1274. If a contract term is clear and unambiguous, the Court will adopt its plain and ordinary meaning. *See, e.g., Moran v. Prather*, 90 U.S. (23 Wall.) 492, 499 (1874); *McAbee Constr.*, 97 F.3d at 1435; *see also Elden v. United States*, 223 Ct. Cl. 239, 250–253 (1980); *Tecom*, 66 Fed. Cl. at 748. "A contract term is unambiguous if there is only one reasonable interpretation." *C. Sanchez & Son, Inc. v. United States*, 6 F.3d 1539, 1544 (Fed. Cir. 1993); *see also Edward R. Marden Corp. v. United States*, 803 F.2d 701, 705 (Fed. Cir. 1986). The plain meaning of a contract term is "the meaning derived from the contract by a reasonably intelligent person acquainted with the contemporary circumstances." *Firestone Tire & Rubber Co. v. United States*, 195 Ct. Cl. 21, 30, 444 F.2d 547 (1971); *see also Hol–Gar Mfg. Corp. v. United States*, 169 Ct. Cl. 384, 388, 351 F.2d 972 (1965); *Tecom*, 66 Fed. Cl. at 748. The Court, then, will employ the ordinary meaning of the words used in an agreement unless there is evidence that the parties meant otherwise --- for instance, through the adoption of a special definition --- or if the term is ambiguous, in which case the Court will interpret the contract according to whether the ambiguity is patent or latent. *Tecom,* 66 Fed. Cl. at 748; *Hol–Gar*, 169 Ct. Cl. at 390, 351 F.2d 972; *L. Rosenman Corp. v. United States*, 182 Ct. Cl. 586, 589–90, 390 F.2d 711 (1968).

Courts interpret latent ambiguities in a contract against the drafting party. *Interstate Gen. Gov't Contractors, Inc., v. Stone*, 980 F.2d 1433, 1434 (Fed. Cir. 1992); *SIPCO Servs. & Marine, Inc., v. United States*, 41 Fed. Cl. 196, 215 (1998). This rule has been held to apply with extra vigor when the drafting party is the government. *See United States v. Seckinger*, 397 U.S. 203, 216 (1970); *SIPCO*, 41 Fed. Cl. at 215.

## B. Plaintiff's Claims for Reimbursement of the Costs of the Fill Material

Plaintiff's complaint pleads four different legal theories supporting its claim for compensation for the costs of importing backfill materials, *see* Compl. ¶¶ 12–41, but the parties agree that their dispositive motions turn on one single issue: the reasonableness of plaintiff's interpretation of the government's answer to Question 27. *See* Tr. (April 18, 2016) at 77–78; Def.'s Reply & Opp'n in Supp. of Mot. for J. on the Pleadings & Summ. J. (Def.'s Reply) at 1.[6] The complaint, and Senate Builders' cross-motion, recite four legal theories in support of plaintiff's request for relief.

---

[6] In its response to plaintiff's cross-motion, the government also contends that genuine issues of material fact would preclude entry of summary judgment in favor of plaintiff. Def.'s Reply at 11–13. Due to the Court's disposition of the motions, that contention need not be addressed.

First, plaintiff claims that the agency breached the contract by failing to issue an equitable adjustment, which it was purportedly obligated to do by the answer to Question 27.  Compl. ¶¶ 12–21; Pl.'s Resp. in Opp'n to Def.'s Mot. for Summ. J. on the Pleadings & in Supp. of Pl.'s Cross-Mot. for Summ. J. & Request for Oral Arg. (Pl.'s Mot.) at 21–22.  Second, plaintiff argues that the government breached the contract's differing site conditions clause by failing to authorize an equitable adjustment for the costs of importing backfill because the contract, as indicated by the answer to Question 27, allegedly represented that all material on site could be used as backfill.  Compl. ¶¶ 22–30; Pl.'s Mot. at 60–65.  Third, plaintiff contends that the answer to Question 27 created an implied-in-fact contract, between it and the agency, to pay for the costs of importing any soil to replace any material found on site that could not be used as backfill.  Compl. ¶¶ 31–37; Pl.'s Mot. at 38–41.  Finally, plaintiff claims that, based on the answer to Question 27, the agency should be estopped from denying its obligation to pay Senate Builders for the cost of importing backfill.  Compl. ¶¶ 38–41; Pl.'s Mot. 44–60.

Though having a number of different sufficient conditions, all of plaintiff's theories share a common necessary condition: its interpretation of the answer to Question 27 must be correct, or at least reasonable.  *See McAbee Constr.*, 97 F.3d at 1435; *C. Sanchez & Son*, 6 F.3d at 1544; *HPI/GSA 3C, LLC v. Perry*, 364 F.3d 1327, 1334 (Fed. Cir. 2004).  If plaintiff's interpretation is not reasonable, then the agency's answer created no obligation to issue an equitable adjustment; did not represent the conditions of the site to be different than they were; could not have created an implied-in-fact contract to pay for the backfill; and did not constitute a representation about the need to import backfill which the government could be estopped from denying.[7]

The case turns, then, upon the meaning of the answer to Question 27.  Plaintiff asserts that it meant that contractors should assume, for purposes of their proposals, that no soil which did not meet the requirements for use as backfill would be encountered on the site.  Pl.'s Mot. at 11.  Senate Builders contends that by asking the bidders to assume this, the government either expressly or implicitly agreed to pay for the costs of importing backfill that met requirements, to the extent that actual soil conditions differed from those the bidders were told to assume.  *Id.*  The government contends that plaintiff's interpretation of the answer to Question 27 is unreasonable because it ignores the context of the question, and conflicts with other language both in Amendment 6 and in other parts of the contract.  Def.'s Mot. at 29–31; Def.'s Reply at 1–8.

---

[7]  Moreover, as Amendment 6 is part of the express contract between the parties, plaintiff may not base an implied-in-fact contract on its contents.  *See Trauma Serv. Grp. v. United States*, 104 F.3d 1321, 1326 (Fed. Cir. 1997).

Plaintiff argues that the answer's injunction to "assume unsuitable material is not encountered" could only mean that bidders were to assume that all soil found on the site could be used as backfill.  Pl.'s Mot. at 15–16; Pl.'s Reply at 1–2.  But Senate Builders' reading of this answer ignores completely the question.  The Court does not find this a reasonable way to interpret anything, and agrees with the government that the context of the question must be considered in order to reasonably determine the meaning of the answer.  Def.'s Reply at 5; *see also* Def.'s Mot. at 8–9.

The first sentence of Question 27 makes plain its limited focus and reads as follows: "Note 2 for detail 'typical Trench, Storm Sewer System' on Page C-501 shows that *additional* excavation may be required if unsuitable material is encountered."  DA at 58 (emphasis added).  The concern that motivated the question, then, was the possibility that while excavating the trenches --- which are depicted in the solicitation, DA at 45 --- the contractor might encounter materials at the bottom of the trench that must be removed, *see* DA at 39 (noting that "unyielding" or "unstable" materials encountered at the bottom of trenches would need to be removed and replaced with either "select granular material" or "initial backfill"); *see also* DA at 35.  The note on the trench detail refers to a rectangle located below grade on the drawing, and the note reads:  "IF UNSUITABLE SOIL MATERIALS ARE ENCOUNTERED, REMOVE AND REPLACE WITH 12 INCHES ADDITIONAL BEDDING OR AS DIRECTED BY CONTRACTING OFFICER."  DA at 45.

After a paraphrase of this note, the third sentence of Question 27 reads: "*The same applies* to the buildings excavation, as indicated in paragraph 1.1.1 Excavation, in section 31-00-00 Earthwork, of the specifications."  DA at 58.  What was *the same* in paragraph 1.1.1 was the recognition that subgrade excavation might be required, beyond the contours of each site.  Discussing excavation measurements, that paragraph stated that these "measurements will include authorized excavation of rock . . . authorized excavation of *unsatisfactory subgrade soil*, and the volume of loose, scattered rocks and boulders collected within the limits of the work . . . ."  DA at 26 (emphasis added).

With this backdrop, the rest of the question and answer may be understood.  The question continued:  "Shouldn't a separate item be created for the select backfill material required *to replace the excavated unsuitable material*?  It is impossible to figure out a quantity at this time since we don't know what the existing conditions will [be] until excavation is started."  DA at 58 (emphasis added).  Clearly, this question concerns unsuitable material that is encountered subgrade --- the material that would be removed by "additional excavation" below a trench, and "the same" circumstance of "authorized excavation of unsatisfactory subgrade soil" below the buildings.  DA 58, 26.  A quantity could not be estimated because the offerors did not know whether any subgrade excavation would be needed.  When the

government responded that the offerors were "to assume unsuitable material is not encountered," DA at 58, this unambiguously meant that contractors need not include a contingency in their bids for the possibility of encountering materials at the bottom of excavation sites that would need to be removed and replaced.[8]

Senate Builders contends that the first three sentences of Question 27 should be ignored, since the last two sentences, as well as the agency's answer, do not specifically mention the subgrade excavation that the earlier sentences concern. Pl.'s Reply at 3–4. But the term "unsuitable material" used in both the question and the answer is referring to the "unsuitable material" that, when "encountered" below grade, requires "additional excavation" and backfill material in its place. DA at 58. The interpretation of procurement contracts obliges courts to step into the shoes of a reasonable contractor, *H.B. Mac, Inc. v. United States*, 153 F.3d 1338, 1345 (Fed. Cir. 1998), and the Court does not believe that a reasonable contractor would have interpreted the answer to Question 27 to mean that all soil on site would be suitable for use as backfill, or that bidders should price the contract on the assumption that this was so.

Part of Senate Builders' misunderstanding seems to stem from its confusing the term "unsuitable material" used in both Question 27 and its answer as a shorthand for materials that would require additional excavation if encountered at the bottom of the trenches, DA at 39, 45, 58, with "unsatisfactory materials" --- the defined term in the solicitation for materials that did not meet the requirements for use as backfill, DA at 28. The specification paragraph cited in Question 27 as presenting "[t]he same" need for additional excavation and replacement is similarly limited to "subgrade soil." DA at 26. Question 27 and its answer did not concern unsatisfactory materials generally, but the subset of these that required subgrade excavation, which were labelled "unsuitable materials." Moreover, plaintiff's interpretation of the answer to mean that all material excavated is suitable for use as backfill cannot neatly be squared with the answers to other questions contained in Amendment 6, in which the government would not confirm that "all excavated material," crushed rock, or crushed concrete and brick could be used as backfill, and referenced instead the specification requirements. *See* DA at 52–53 (Questions 2, 6 and 7).

The existence of geotechnical reports indicating that soil on-site did not meet the specification requirements for use as backfill also undermines plaintiff's proffered interpretation. DA at 22–23. There were two such reports, each one

---

[8] The Court notes that the "General Excavation" paragraph from the "Execution" part of the "Earthworks" specification also employed the word "encountered" in reference to materials found subgrade, instructing the contractor to "[e]xcavate unsatisfactory materials *encountered* within the limits of the work *below grade* and replace with satisfactory materials as directed." DA at 33–34 (emphasis added).

based on a boring near one or the other building sites, and both indicated that the soil at the sites did not meet the solicitation's backfill requirements. The first report indicated that the soil was classified as "GM," a type of soil that did not meet the requirements for use as backfill. DA at 22, 28. The soil test results contained in the other report indicated soil that likewise failed to meet the solicitation's requirements. DA at 23 (noting that the soil had fines of 13%); DA at 28 (providing that backfill must be either GW or SW); DA at 174 (providing a limit of 5% fines for GW or SW soil).

Plaintiff argues that its interpretation of the answer to Question 27 is "entirely consistent with all other terms of the plans and specifications," referencing in particular the provisions that dictate the reuse of excavated materials as backfill. Pl.'s Mot. at 28; *see also id.* at 4–6. But while some provisions instruct the contractor on the transportation, use, and storage of "satisfactory excavated materials," DA at 33–34, *see also* DA at 37–38, and even go so far as to warn the contractor not to "waste any satisfactory excavated material without specific written authorization," *id.* at 38, this hardly constitutes a guarantee that satisfactory excavated material will be sufficient to meet all backfill needs. Indeed, several provisions were predicated on the contrary assumption, that satisfactory excavated materials would not be sufficient.

For instance, the solicitation contained a statement that "no borrow site/material is available at Picatinny Arsenal." DA at 125. The solicitation also contained a number of provisions requiring the contractor to obtain a source of borrow material. *See* DA at 31–32 (requiring testing of proposed borrow site and submission of test results to the agency for approval by the contracting officer); DA at 33–34 (providing that backfill materials in excess of those available onsite shall be obtained from a borrow area selected by the contractor). The solicitation specified that "the Contractor is responsible for obtaining the right to procure material, pay royalties and other charges involved, and bear the expense of developing the sources, including rights-of-way for hauling from the owner" in connection with obtaining materials from a borrow site. DA at 36. These provisions would be meaningless if the answer to Question 27 meant that offerors could assume all backfill needed would be generated from the excavation and should price their offers accordingly.

The agency properly interpreted the answer to Question 27 as meaning that offerors should assume there would be no additional subgrade excavation requiring replacement backfill. Under this interpretation, had Senate Builders encountered such "unsuitable material" below grade, it would have been entitled to reimbursement for the cost of any additional satisfactory material it had imported as backfill to replace this "unsuitable material." *See* DA at 26 (stating "allowance will be made on the same basis for selected backfill ordered as replacement"). Plaintiff, however, has not made such a claim. Instead, its case rests on an

interpretation of the answer to Question 27 that is not reasonable.  For the reasons stated above, defendant is entitled to summary judgment in this case.[9]

### III.  CONCLUSION

Because all of Senate Builders' legal theories depend on an unreasonable interpretation of the answer to Question 27, the government's motion for summary judgment is **GRANTED** and plaintiff's motion for summary judgment is **DENIED**. The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/Victor J. Wolski
**VICTOR J. WOLSKI**
Judge

---

[9]  As defendant is entitled to summary judgment concerning Count IV, the Court need not address the government's motion in the alternative for judgment on the pleadings concerning that count.